Filed 4/14/21  In re M.M. CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FIVE

| | |
|---|---|
| In re M.M., a Person Coming Under the Juvenile Court Law. | B308111 |
| | (Los Angeles County Super. Ct. No. 19CCJP07249A) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>RICHARD M.,<br><br>    Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Tamara Hall, Judge. Conditionally affirmed, and remanded with directions.

Vincent Uberti, under appointment by the Court of Appeal, for Defendant and Appellant.

Rodrigo A. Castro Silva, County Counsel, Kim Nemoy, Assistant County Counsel, Erica Edelman-Benadon, Senior Deputy County Counsel, for Plaintiff and Respondent.

———————————————

Richard M. (father) appeals the findings and orders made by the juvenile court at a six-month review hearing under Welfare and Institutions Code section 366.21, subdivision (e).[1] Father contends that respondent Los Angeles County Department of Children and Family Services (Department) did not provide reasonable reunification services, and the juvenile court erroneously found that returning M.M. (minor) to his custody would be detrimental. Father also contends the court and the Department failed to comply with the Indian Child Welfare Act (ICWA) (25 U.S.C. § 1901 et seq.). We conditionally affirm and remand the case for the limited purpose of compliance with ICWA.

---

[1] All statutory references are to the Welfare and Institutions Code, unless stated otherwise.

## FACTUAL AND PROCEDURAL BACKGROUND

*Referrals and initial investigation*

Minor was born in October 2017, and her parents are J.P. (mother)[2] and father. The Department's investigation was triggered by two separate law enforcement calls in late September 2019, which the Department concurrently investigated.

Law enforcement responded on to a September 29, 2019 domestic violence incident between mother and father. Mother called the police, who arrived after father had already left. Mother told law enforcement that there were past incidents of domestic violence between father and her, both reported and unreported, during their two-year relationship. Mother stated that she and father had been arguing and he became more upset and began throwing small objects at her when he could not find his car keys to leave. When father found his keys, mother was standing near the front door; father pushed her with both arms, took minor, and began walking to the parking lot. Mother

---

[2] Mother is not a party to this appeal. Mother was formerly a dependent in Riverside County, due to her parents' incarceration on murder charges. She received non-minor dependent extended foster care services from 2013 to 2017, and court records indicate she was known to possess drug paraphernalia and refused to participate in therapy services.

followed him and tried to help put minor in the car seat, but father became angry and hit mother in the face. Mother took minor and went back into the apartment. Mother did not have any visible injuries; she denied medical treatment and did not want an emergency protective order.

The next day, police responding to a vandalism call observed mother and a female friend vandalizing a vehicle while minor was left unattended. Mother and her friend were arrested on felony vandalism charges, and minor was released to father, who was not involved in the vandalism and who traveled to the police department to pick up minor.

In early October 2019, police responded to an emergency call made by father after mother said she wanted to drive the car into a wall, and locked herself in the bathroom, possibly with a knife. Mother was involuntarily hospitalized under section 5150, and was diagnosed with major depression. Father noted that mother was currently taking psychotropic medication, and he said he was not concerned for minor's safety, saying he checked on them every day, and if mother was having a hard day, he would take minor to father's mother's home (i.e., minor's paternal grandmother's home).

On October 18, 2019, a Department case social worker made an unannounced visit to the home and interviewed mother and father about the referrals. Mother and father were both cooperative in agreeing to speak to the social worker. Mother was emotional, father was calming and protective, and both signed a safety plan agreeing to

cooperate with the Department's investigation and attend a child and family team (CFT) meeting to explore service options. Mother also agreed in the plan to follow through with mental health treatment, including taking prescribed medications.[3] However, mother refused to sign forms consenting to the release of medical information, ultimately walking away from the social worker into another room and stating "I don't want my name all over you guys' system. I'm not signing anything."

The Department continued to gather information regarding the incidents underlying the referrals after interviewing the parents, including obtaining law enforcement's incident report of mother's October 2019 hospitalization. The social worker spoke with mother by phone on October 22, 2019; mother reported she was doing well and promised to call back later that day to provide information on an upcoming intake therapy appointment at a mental health clinic, which was due to take place that week. Mother appears not to have followed up, and the social worker tried to reach her again on October 29, 2019, but she did not answer her cell phone after prolonged ringing, and the social worker left a voicemail requesting a return call.

---

[3] A copy of the safety plan does not appear in our record.

5

*Detention and further investigation*

On November 4, 2019, the Department filed a petition and obtained an order authorizing them to detain minor. The social worker's affidavit noted that "parents' increasing unwillingness to fully cooperate with the current [Department] investigation has become increasingly evident as mother refused to sign consent for release of mental health records forms, and has not contacted [the social worker] to provide update on her efforts to comply with the terms and conditions of the implemented safety plan." The social worker also stated that mother and father were not forthcoming, as they denied engaging in any acts of domestic violence, and withheld detailed information about mother's October 2019 hospitalization. Finally, the social worker noted the safety plan was not a legally enforceable court order and removal was necessary. The Department detained minor and filed a petition alleging minor was a dependent under section 300, subdivisions (a) and (b), based on domestic violence between mother and father and mother's mental health issues.

The Department's ongoing investigation revealed a prior domestic violence incident in 2018. Both parents acknowledged they had argued, but denied that father had pushed mother down the stairs, instead stating that mother had slipped on some salsa that had spilled on the stairs. Both parents denied that there was any domestic violence on September 29, 2019. Mother denied she had called the police

and claimed the police report was inaccurate. Father acknowledged he and mother had argued, both in the apartment and at the car. He described a miscommunication, but was unaware that the police had been called. Father denied hitting mother, and pointed out that mother had no bruising. Regarding the vandalism on September 30, 2019, mother said she and a friend had confronted her former boyfriend's new girlfriend, and they vandalized the car while they were not thinking. Mother denied minor was left unattended. Father was unaware of the incident until after mother was arrested. During father's interview, he described learning that mother was likely having a relationship with another man. Asked about the future of his relationship with mother, father said he was willing to work on it if they could trust each other.

*Adjudication and disposition*

On January 6, 2020, the juvenile court sustained amended petition allegations and ordered that minor would remain removed from parental custody. The court ordered reunification services for both parents. Mother's case plan required her to submit to 10 random drug tests, with a full drug program if any test was missed or dirty, to engage in mental health counseling, and to take all prescribed psychotropic medications. Both mother and father were to attend individual counseling to address case issues, anger management, and conjoint counseling if they remained in a

7

relationship with each other. The court ordered the Department to assess and provide any available funds to facilitate parents' participation in programs, to provide a written visitation schedule for nine hours of monitored visitation per week, with mother and father to not visit together. Neither parent appealed the January 6, 2020 jurisdictional findings or dispositional orders.

*Six-month review period*

The Department summarized father's reunification efforts in its six-month review report, dated September 30, 2020.[4] Mother and father were living together and planned to remain together. Father was working and mother was attending school. Both parents participated in monitored visitation consistently, whether in person three times a week, or on daily video chat visits due to pandemic restrictions. The social worker observed that minor had a strong bond with both parents. The Department visitation monitor raised a concern that during a majority of the visits the parents just had minor watch videos on a cell phone, although the Department did not raise further objections after the parents explained that they like watching videos as a family and minor finds it comforting. The monitors also had to admonish the parents from talking about case issues

---

[4] The six-month review hearing was initially scheduled for July 6, 2020, but was continued due to the COVID-19 pandemic and its impact on court proceedings.

8

in minor's presence at the visits; mother and father complied with that instruction.

The Department's report stated:  "During this reporting period, the [Department] has provided the parents with Family Reunification services.  As part of these service components, [the Department] has done the following:

- Monthly face-to-fact contacts with [minor], caregiver and parents
- Video Chat visits due to Covid-19
- Monitored [minor's] medical, dental, developmental and mental health needs
- Case Management
- Arranged and participated in CFT Meetings on behalf of [minor]
- Provided parents with referrals and court ordered case plan
- Provided [mother] with ID's for drug testing purposes
- Coordinated family therapy sessions for [minor] with her parents."

The social worker provided both parents with their court-ordered case plan, minute order, and referrals on February 7, 2020, and both parents signed a letter acknowledging they received the information.  Father also signed an acknowledgement that he received counseling referrals on March 3, 2020.  Father told the social worker he was having challenges enrolling in counseling because most places would not accept his private insurance, and would only accept Medi-Cal.  The social worker advised father that

father would need to choose a provider, have them provide a written estimate of the cost, and then the Department would assess whether there was available funding to assist. While the timing of the communication between the social worker and father is not apparent from the report, the social worker noted that father did not provide the Department with any cost information. Father enrolled in a 12-week parenting program in July 2020, and would provide proof of completion when the program ended. The social worker noted that father was not ordered to take a parenting program, but he felt it would be beneficial.

Mother started individual counseling in January 2020 and was also attending anger management sessions weekly. The social worker sent mother a referral for video counseling on April 28, 2020, stating "I know you mentioned that you were going to start conjoint counseling, but if there are any issues with it please see the attached services being offered online." Nothing in the record shows the social worker sent anything similar to father.

In May 2020, mother provided the social worker with contact information for her and father's conjoint therapist. After the social worker provided the therapist with case documents, the therapist informed the social worker she would not be able to provide conjoint therapy sessions due to the couple's domestic violence history.

Mother and father started weekly family therapy sessions with minor on July 31, 2020. The family therapist provided the Department with a written report, explaining

that minor was referred due to difficulties with transition, resulting in excessive temper tantrums. Sessions began with minor and foster mother, and the parents began participating in July. Parents had excellent attendance and actively participated in the sessions. The parents "expressed and demonstrated their commitment to reunifying with [minor]. They are attentive to her needs during session. They have been open to feedback from therapist and are dedicated to making reunification a smooth process for [minor.] [Minor] seeks out affection and takes joy in playing with her parents during their sessions together."

Much of the Department's six-month report focused on mother's drug testing requirements, including a number of missed tests and tests with positive results for marijuana. Mother sent e-mails arguing she had satisfied her drug testing requirement, while the social worker reported that mother's missed tests meant that mother had to participate in a substance abuse program.

On August 31, 2020, mother e-mailed the Department and her attorney to report that after conducting a home inspection on August 24, 2020, and telling mother and father she would get back to them by the end of the day about unmonitored visits, the social worker had been unreachable. Mother described an "ongoing and recurring problem" of needing to go over the social workers' heads to get anything done. The following day, the social worker responded to explain that the Department would not be granting unmonitored visits based on mother's no-shows and positive

11

drug tests, and reminding mother that based on her missed tests, she needed to participate in a full drug program with aftercare. Mother responded, accusing the social worker of changing the requirements for unmonitored visits, repeating that the social worker was failing to respond to calls and texts, and stating she (mother) would not participate in a drug program.[5] The Department recommended that reunification services continue for both parents.

*Six-month review hearing*

At the September 30, 2020 six-month review hearing, the court stated it had reviewed the Department's report, and heard argument about placement and services. Mother argued she was in substantial compliance with her case plan, arguing the Department had not asked her to do a full

---

[5] The full text of mother's e-mail stated, "You have and Your supervisor have a personal vendetta against me, and always have but that is not my problem, that is YOURS. I was told they wanted to see my levels Drop which, they clearly did considering the LAST TEST. I was only scheduled to do testing until JULY 25th which is on the paper work that YOU Sent me directly. Like I said That's not on me, that's on you because you fail to communicate, you fail to answer calls or texts, you fail to return them and you fail at doing your job. For weeks at a time no one can reach you. I WILL NOT be participating in a drug program and I will make sure that you and [another social worker] are looked into."

substance abuse program, and pointing out there was no evidence she was ever under the influence during visits with minor. She asked for minor's return, and alternatively for unmonitored visits.

Father reminded the court that the Department had the burden of showing detriment, that it had not done so, and that the Department had failed to provide reasonable reunification services, particularly because father had not received any funding assistance for services. Father pointed to the Department's delayed and inadequate responses to his request for financial assistance in signing up for conjoint counseling, delays in responding to father's text messages, and the fact that despite positive, consistent visits, the Department was not willing to liberalize to unmonitored visits to permit the parents an opportunity to show what they had learned. Father pointed out he was taking a parenting class even though it was not ordered by the court. If the court was not willing to return minor to both parents, father asked for release to father, with the condition that father would reside with paternal grandmother and participate in any services or conditions the Department requested, including unannounced home visits and family maintenance services. Because there was no factual basis to keep minor removed from father, releasing her to father would help the Department better assess and address any concerns that might arise.

The Department argued that based on the sustained petition allegations and the parents' failure to participate in

court-ordered programs, the court should not grant the parents' request to return minor to parental custody, because a parent's non-compliance with the case plan is evidence of risk of detriment.

Minor's counsel clarified that at disposition, the court permitted parents to do conjoint counseling rather than a domestic violence program, but because parents had not participated in counseling to address the domestic violence, minor remained at risk.

The court found by clear and convincing evidence that the parents had made minimal progress towards reunification. Father's participation in a parenting program and both parents' participation in family therapy sessions were to be commended, but neither parent had addressed the domestic violence that brought the case to the court. The court found by a preponderance of the evidence that returning custody to father alone or to both parents posed a substantial risk of detriment to minor's safety, protection, physical and/or emotional well-being.[6] The court reminded both parents that failure to participate in court-ordered treatment constituted prima facie evidence that return would be detrimental. The court found that the Department had complied with the case plan in making reasonable efforts to return the child to a safe home and complete any

---

[6] The minute order states that the court found made the detriment finding based on clear and convincing evidence, but the reporter's transcript shows that the court found detriment by a preponderance of the evidence.

14

necessary steps to finalize the permanent placement of the child.  Both parents' requests for unmonitored visits were denied.

Father filed a notice of appeal on October 5, 2020.

## DISCUSSION

*Reasonable services*

At the six-month review hearing, the court must determine whether the Department has made reasonable efforts to provide reunification services to father and the extent of his progress toward alleviating or mitigating the causes that led to the minor's detention.  (§§ 366, subd. (a)(1)(B), 366.21, subd. (e)(8) [six-month review-reasonable services].)  The Department "must make a good faith effort to provide reasonable services responsive to the unique needs of each family, and the plan must be . . . ""designed to eliminate those conditions which led to the juvenile court's jurisdictional finding."" [Citation.]" (*Patricia W. v. Superior Court* (2016) 244 Cal.App.4th 397, 420 (*Patricia W.*).) "Services will be found reasonable if the Department has 'identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained reasonable contact with the parents during the course of the service plan, and made reasonable efforts to assist the parents in areas where compliance proved difficult . . . .' [Citation.]" (*In re Alvin R.* (2003) 108 Cal.App.4th 962, 972–

15

973.)  The adequacy of a reunification plan and the reasonableness of the Department's efforts "are judged according to the circumstances of each case." (*Amanda H. v. Superior Court* (2008) 166 Cal.App.4th 1340, 1345 (*Amanda H.*) [social services agency must make good faith effort to create and effectuate reunification plan].)  "The standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances." (*In re Misako R.* (1991) 2 Cal.App.4th 538, 547.)  The Department must show by clear and convincing evidence that reasonable reunification services have been provided.  (*In re Monica C.* (1995) 31 Cal.App.4th 296, 306.)

We review a finding that reasonable services were provided for substantial evidence, considering the record in the light most favorable to the Department.  (*Patricia W.*, *supra*, 244 Cal.App.4th at p. 419.)  ""If there is substantial evidence supporting the judgment, our duty ends and the judgment must not be disturbed."' [Citation.]" (*Amanda H.*, *supra*, 166 Cal.App.4th at p. 1346.)  However, when the burden of proof at the trial court level is clear and convincing, the substantial evidence standard of review should account for the higher level of certainty demanded by that burden of proof, as compared to facts proven by preponderance of the evidence.  (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 998–1006.)

Father contends that based on the reporter's transcript, the juvenile court failed to determine whether the

Department had provided reasonable reunification services to father. He acknowledges that the clerk's transcript does contain the required finding, but notes that the language of the clerk's transcript does not indicate which evidentiary standard the court applied.

We reject father's argument that the juvenile court failed to make the required reasonable services finding. During the hearing, the court was actively engaged with all the attorneys, acknowledging that the Department had the burden of proof, and asking questions about father's enrollment in services. While the court may not have used the precise wording of section 366.21, subdivision (e)(8), when it found that the Department had "complied with the case plan in making reasonable efforts to return the child to a safe home," we understand that the court is deciding both that the Department has met the requirements for federal funding and provided reasonable reunification services.

Father argues that the Department failed to provide reasonable services because it did not maintain consistent and timely contact with the parents. The Department's six-month review report, which was admitted into evidence, states that the social worker had monthly contact with the parents and provided father with referrals. When father had difficulty finding low cost programs that took his insurance, the social worker was responsive, advising father on the process for getting reimbursement. At the hearing, counsel for father and the Department presented competing arguments about whether the Department had complied

17

with the court's order to provide funding assistance. The record also shows the court asked counsel questions about the challenges father faced in enrolling for counseling. On the question of the social worker's responsiveness, it is not our role to second-guess the trial court's credibility determinations. (*In re Yolanda L.* (2017) 7 Cal.App.5th 987, 992.) The report states that the social worker asked father to provide documentation of program costs, and had not received the requested information. On these facts, we find substantial evidence that the Department provided reasonable reunification services.

*Detriment finding and decision to deny father's request for M.M.'s return*

At the six-month review hearing, the juvenile court must return the child to his or her parent's custody unless it finds by a preponderance of the evidence that such return would "create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child." (§ 366.21, subd. (e)(1).) The Department bears the burden of proving risk of detriment. (*David B. v. Superior Court* (2004) 123 Cal.App.4th 768, 789.)

Whether the placement of a child with her parent would be detrimental is to be examined by looking at the totality of the circumstances. (See *A.H. v. Superior Court* (2010) 182 Cal.App.4th 1050, 1059 ["[d]etriment can be shown many different ways"].) Relevant circumstances

18

include (1) the relevant parent's "[c]ompliance with the reunification plan" (*Constance K. v. Superior Court* (1998) 61 Cal.App.4th 689, 704 (*Constance K.*)), and, separate and apart from that compliance, (2) the "effect . . . return [to the parent's custody] would have on the child" (*In re Joseph B.* (1996) 42 Cal.App.4th 890, 901) as well as "the manner in which the parent has conducted . . . herself in relation to a minor in the past" (*Constance K.*, at p. 705).

We review a juvenile court's finding that such detriment exists for substantial evidence. (*In re E.D.* (2013) 217 Cal.App.4th 960, 965–966.) Substantial evidence is evidence that is of "'reasonable, credible, and of solid value'" such that a reasonable trier of fact could make such findings. (*In re Angelia P.* (1981) 28 Cal.3d 908, 924.) The appealing party "bear[s] the burden to show there was no evidence of a sufficiently substantial nature to support those findings and orders. [Citation.] We draw all reasonable inferences from the evidence to support the findings and orders of the juvenile court and review the record in the light most favorable to the court's determinations; we do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the trial court's findings. [Citation.] Thus, we do not consider whether there is evidence from which the juvenile court could have drawn a different conclusion but whether there is substantial evidence to support the conclusion that the court did draw. [Citation.]." (*In re M.R.* (2017) 8 Cal.App.5th 101, 108.)

Father contends there was no substantial evidence to support the juvenile court's determination that returning minor to father's custody would place her at substantial risk of detriment. The dependency case began after a domestic violence incident between mother and father, and the two remained in a relationship after minor was detained. Despite a court order to do so, neither parent had enrolled in individual counseling to address that domestic violence. "The failure of the parent . . . to participate regularly and make substantive progress in court-ordered treatment programs shall be prima facie evidence that return would be detrimental." (§ 366.21, subd. (e)(1).)

Father seeks to excuse his failure to participate by pointing out that no additional incidents had taken place, and the parents' visits with minor were positive. Father argues the positive parenting-child relationship between himself and minor weighs in favor of returning minor to his custody. This does not, however, demonstrate that there is no substantial evidence to support the court's detriment finding.

### ICWA inquiry and findings

Although father initially denied any Indian ancestry, at the November 12, 2019 detention hearing he filed an ICWA-20 form (parental notification of Indian status) claiming he may have Indian ancestry. Father identified paternal great grandmother Superba C., noting the name of

20

the tribe as "unknown," and identifying the band as "Kentucky."  Paternal grandmother was present at the detention hearing.  She affirmed she had family from Kentucky and said she would have to ask her brother.  The court ordered the Department to interview father and any available paternal relatives about potential Indian ancestry, and to notice any tribes identified.

When the Department later interviewed father, he denied any Indian ancestry, despite being reminded of his earlier claim.  The Department called and left messages for paternal grandmother twice in December 2019.  Although the social worker was in contact with paternal aunt when minor was placed with her, there is no indication that the social worker ever asked paternal aunt about potential Indian ancestry, or took any steps to identify or contact any other paternal relatives.  The Department's jurisdictional report stated that ICWA did not apply, and ICWA was not discussed at the adjudication hearing on January 6, 2020.

According to a March 2, 2020 last minute information report, a social worker spoke to paternal grandmother about potential placement.  Nothing in that report indicated that paternal grandmother was asked about Indian ancestry or relatives in Kentucky.

The Department's six-month review report stated that ICWA "does or may apply" and that the court had not yet made ICWA findings for father.  The Department noted that the court had previously ordered it to investigate possible Indian ancestry, but did not mention any interview

21

attempts, other than the December 2, 2019 interview when father denied Indian ancestry.

The court did not inquire about the Department's ICWA investigation or make any ICWA findings at the six-month review hearing.

Father contends the Department's and the juvenile court's failure to investigate father's claim of possible Indian ancestry is error requiring reversal of the court's jurisdictional findings and dispositional orders.

"Congress enacted ICWA in 1978 in response to 'rising concern in the mid-1970's over the consequences to Indian children, Indian families, and Indian tribes of abusive child welfare practices that resulted in the separation of large numbers of Indian children from their families and tribes through adoption or foster care placement, usually in non-Indian homes.' [Citation.]" (*In re Isaiah W.* (2016) 1 Cal.5th 1, 7 (*Isaiah W.*).) "In California, . . . persistent noncompliance with ICWA led the Legislature in 2006 to 'incorporate[] ICWA's requirements into California statutory law.' [Citations.]" (*In re Abbigail A.* (2016) 1 Cal.5th 83, 91; see also *In re Breanna S.* (2017) 8 Cal.App.5th 636, 650 [California law "incorporates and enhances ICWA's requirements"].) Both ICWA and California law define an "Indian child" as a child who is either a member of an Indian tribe or is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe. (25 U.S.C. § 1903(4); § 224.1, subds. (a) & (b); see also *In re Elizabeth M.* (2018) 19 Cal.App.5th 768, 783.)

The court and the Department have an affirmative and continuing duty under the ICWA and related California law to inquire whether a child who is the subject of a dependency proceeding is or may be an Indian child. (*Isaiah W.*, *supra*, 1 Cal.5th at pp. 7–8.) The scope of the duty of inquiry is defined in regulations promulgated under ICWA (see 25 C.F.R. § 23.107 et seq. (2016)), California statutes and rules of court. (*In re T.G.* (2020) 58 Cal.App.5th 275, 290–291.) We apply the federal and state statutes in effect on the date of the hearing. (*In re A.M.* (2020) 47 Cal.App.5th 303, 321.)

The Department's initial duty of inquiry at the beginning of a child welfare proceeding includes "asking the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child." (§ 224.2, subd. (b).) The court must inquire at each party's first appearance, whether any participant in the proceeding "knows or has reason to know that the child is an Indian child." (§ 224.2, subd. (c).) Part of the initial inquiry also includes requiring each party to complete the ICWA-020 form. (Cal. Rules of Court, rule 5.481(a)(2)(C).)

When information is provided "suggesting that either the parent of the child or the child is a member or may be eligible for membership in an Indian tribe," there is reason to believe that an Indian child is involved in a proceeding, and further inquiry is required. (§224.2, subd. (e)(1); *In re T.G.*, *supra*, 58 Cal.App.5th at p. 290, fn. 14.) As relevant

23

here, further inquiry includes interviewing parents and extended family members to obtain information such as the names of the child's "biological parents, grandparents, and great-grandparents, . . . as well as their current and former addresses, birth dates, places of birth and death, tribal enrollment information of other direct lineal ancestors of the child, and any other identifying information, if known." (§ 224.3, subd. (a)(5)(C); see also § 224.2, subd. (e)(2)(A); Cal. Rules of Court, rule 5.481(a)(4)(A).) The agency engaging in further inquiry should also contact the Bureau of Indian Affairs, the State Department of Social Services, and any tribes the child may be affiliated with, and anyone else, that might have information regarding the child's membership or eligibility in a tribe. (§ 224.2, subds. (e)(2)(B) & (e)(2)(C); Cal. Rules of Court, rule 5.481(a)(4)(B) & (C).)

If the court or the Department has reason to know that the child is an Indian child under ICWA, then the relevant tribes must be given notice of the proceedings. (25 U.S.C. § 1912(a); §224.3, subd. (a).)

The Department concedes that after the court directed the Department to interview any available paternal relatives about father's claim of Indian ancestry, the Department's reports did not reflect any inquiry efforts, and the court did not make any ICWA findings at the six-month review hearing. The Department does not oppose a remand of this matter to permit the juvenile court to direct the Department to conduct further inquiry and to make ICWA findings and orders.

Because both the Department and the court are under a continuing duty of inquiry (*Isaiah W.*, *supra*, 1 Cal.5th at pp. 10–15), we conditionally affirm the court's orders and remand the matter for the juvenile court to carry out the requirements of section 224.2, subdivision (e), and direct the Department to make and document its efforts to interview paternal relatives to determine whether there is reason to know that minor is an Indian child, and to make ICWA findings as warranted.

## DISPOSITION

The juvenile court's September 30, 2020 orders are conditionally affirmed. The matter is remanded to the juvenile court with directions to comply with ICWA and Welfare and Institutions Code, section 224.2, subdivision (e).


MOOR, J.


We concur:


BAKER, Acting P. J.　　　　KIM, J.


25